[No. 189-41341-2.    Division Two.    December 31, 1970.]

CONVOY COMPANY et al., *Appellants*, v. WASHINGTON UTIL-
ITIES AND TRANSPORTATION COMMISSION et al.,
*Respondents*.

*Reaugh, Hart, Allison, Prescott & Davis, George H. Hart,* and *Jack R. Davis,* for appellants.

*Slade Gorton, Attorney General,* and *Robert E. Simpson, Assistant,* for respondents.

PETRIE, J.—Richard Selland and John Davis, d/b/a Auto Transport, and operating under a temporary carrier permit issued by the Interstate Commerce Commission (ICC), applied to the Washington Utilities and Transportation Commission (WUTC) for an extension of their permit for authority to engage in the statewide, intrastate transportation of new and used automobiles and light-duty trucks by the truckaway method. The only two carriers whose permits authorize such transportation, Convoy Company and Transport Storage & Distributing Company, protested granting of such application. After a hearing conducted in August, 1967, the examiner issued a Proposed Order Granting Application on February 26, 1968. The protesting carriers jointly filed a petition to reopen and for reconsideration. Subsequently, the protestants were granted permission to, and did, file exceptions to the examiner's proposed order. On June 6, 1968, the commission denied the petition, affirmed the examiner's proposed order and adopted the same as the final order of the commission. The protesting carriers again filed a petition for reconsideration, and on September 9, 1968, the commission issued an order denying the petition and affirming its prior final order. Convoy and Transport Storage appealed to the superior court. After the trial court affirmed the commission's last order, the protestants have appealed to this court.

The appellants have set forth 16 separate assignments of error, which, however, may be assimilated into three issues as follows:

1. The commission's order affirming the examiner's proposed order, which amended the applicants' common carrier permit to include: "Intrastate, irregular route, non-

radial service as a carrier of motor vehicles consisting of new and used automobiles and light duty trucks only, by truckaway method, in the State of Washington" is clearly erroneous in view of the entire record and the public policy of the act authorizing the commission's order, insofar as the commission found as a fact that such amendment was in the public interest and required by the present or future public convenience and necessity;

2. The commission's order is affected by an error of law insofar as it determined (a) that there was a profound need for a new carrier to render specialized service as proposed by the applicants, and (b) that the two protesting carriers were not in every respect rendering adequate service to shippers who appeared in support of the application, because none of applicants' witnesses had ever utilized the services of one of the protesting carriers, Transport Storage and Distributing Company.

3. The commission's order was arbitrary and capricious insofar as it refused to reopen the hearing to consider new evidence, discoverable only after the hearing, as alleged in the protesting carriers' petition to reopen and reconsider, particularly that subsequent to the hearing, the applicants had gone out of business and had disposed of their equipment and facilities.

We measure the first issue by the standard of whether or not on review of the record, although there is evidence to support the commission's order, we are left with the definite and firm conviction that a mistake had been committed. *United States v. United States Gypsum Co.*, 333 U.S. 364, 92 L. Ed. 746, 68 S. Ct. 525 (1948); *Ancheta v. Daly*, 77 Wn.2d 255, 461 P.2d 531 (1969); *Tunget v. State Employment Security Dep't*, 2 Wn. App. 574, 468 P.2d 734 (1970).

The evidence reveals that the applicants, who had previously been engaged in the used car sales business, acquired three truck and trailer units capable of transporting automobiles and light-duty trucks by truckaway method; that they had obtained temporary authority from the ICC

to engage in the transportation of such vehicles, interstate, in the states of Washington, Oregon, Idaho and Montana; and that they had engaged in such activity for 45-50 days prior to termination of such authority several weeks before the hearing.

Convoy Company and Transport Storage and Distributing Company are the only two common carriers authorized by WUTC to engage in intrastate transportation of motor vehicles by truckaway method. Both are also authorized to, and do, engage in interstate transportation of vehicles. Convoy has two terminal facilities in the state, at Seattle and Spokane, and has a total of 41 transporting units available for service. In the 7-month period, January-July, 1967, $23,000 of its gross revenue constituted intrastate business, contrasted with its gross revenue of slightly over $2,000,000 from its annual interstate traffic generated at its two Washington terminals. Approximately 70 per cent of its intrastate volume is generated by transporting Volkswagen vehicles. Its business is somewhat seasonal, occasioned primarily by the annual shutdown in manufacture of domestic automobiles. Its average annual unused capacity is 10-15 per cent, but this must be measured by its then current unused capacity (at the time of the hearing in August, 1967) of 85-90 per cent. We note, parenthetically, that only a month of 85 per cent unused capacity would, itself, produce a 7 per cent average annual rate of unused capacity. Convoy maintains an active solicitation program, and all the applicants' witnesses knew of its services; most had tried it, but expressed dissatisfaction with delivery time when less than a full load was sought. The same witnesses, however, conceded lack of economic feasibility for a carrier to render single pick-up service as a standard method of operation.

Transport Storage and Distributing Company has a terminal at Renton, Washington, and has a total of 12 tractor-trailer transport units, with two spare tractors also available for use. Its primary revenue is generated through interstate transportation of General Motors vehicles. Less than 5 per

cent of its revenue is developed by intrastate activity, including the haul of 246 units under a contract with the state of Washington in the period January through July, 1967. The general manager testified, "No, we never go out with less than a full load. We go out with an awful poor load sometimes." A poor load was described as one in which four or five separate "drops" are required because of various destination points. Transport Storage maintains that it solicits business from dealers of whom it has knowledge. Shippers who testified on behalf of the applicants, especially those in eastern Washington, had not heard of Transport Storage, and none of the applicants' witnesses had ever utilized Transport Storage's facilities. The company is listed in telephone directories in King and Pierce Counties.

Most import cars are distributed through a single warehouse located in Seattle. Approximately 1100-1400 cars are processed through that warehouse each month. During the 7-month period January-July, 1967, Convoy transported a total of 923 vehicles, intrastate, most of them through this Seattle warehouse; and Transport Storage transported 32 such vehicles through the same facility in the same time period. Other import vehicles leave the distribution point by driveaway method or are shipped via railroad. Dissatisfaction exists by use of either of these two latter methods, either by way of expense or delay in delivery or, in the case of driveaway, because the vehicle has accumulated road mileage and has been exposed to road hazard by the time it reaches the dealer's sales lot.

An import dealer from Spokane, who maintains an inventory of 40-50 cars, related his experiences with Convoy:

> Well, at first there they were doing pretty good by us, and then pretty soon they got more independent, you know, and we'd order differently and they just didn't seem to like that business. They have a—I don't know how to explain it—just a high air about them, they couldn't care less whether they took it or not.

After explaining his shipping needs and the needs of

some of his competitors in the same sales area, he testified:

> We want somebody that will put the load together for us and Convoy can't do it. They won't do it. They're too busy and they can't do it. Somebody that's small and interested in the small operation, that's what I'm interested in. We would give them our business and we want somebody that's interested in us and in our problems and our little orders. Not in big orders, I mean small orders.

Financial institutions, which finance purchase of vehicles, are confronted with the necessity to repossess such vehicles from time to time. In many instances, time is of the essence, not only to prevent vandalism but also to reduce possible storage costs, and occasionally because of a necessity to return the vehicle to the dealer within 90 days of date of default in order to meet the repurchase agreement. An assistant vice-president of a bank with 41 branches throughout the state, testified, "There probably isn't a day goes by that we don't have a repossession some place." He indicated that his institution has utilized the services of Convoy, but not Transport Storage. He described the service from Convoy as follows:

> Oh, I've had good service and bad service. I've had bad service to the extent that sometimes I've called them and I've got a car at a given point and I have to have it back here at a certain date and they've said, "I don't know whether we can handle it", or they've outright said, "I'm sorry we can't handle it within that deadline but we can get it back to you but by what date I don't know."

In view of the record, we cannot reach a definite and firm conviction that a mistake has been made. The finding of the WUTC, that the applicants' request for extension of authority is "in the public interest and is required by the present and future public convenience and necessity", is not clearly erroneous. *Ancheta v. Daly, supra.*

We turn, then, to the second major issue presented by this appeal. It is uncontroverted that none of the shipper witnesses ever used, or requested, the services of Transport Storage and Distributing Company—and only two of such witnesses had even heard of the company. The protesting

carriers contend that such fact alone is sufficient, as a matter of law, to negate any showing of a public necessity to add a new carrier to the intrastate effort. Certainly, the carriers contend, no agency can find the existing service inadequate when no witness has utilized a part of the service available.

It appears to us that there are two answers to this contention. The first is factual. The thrust of the complaint of the shippers who supported the applicants' request is that Convoy's operations, whose services they *have* tried, in the case of both new and used vehicles, are unsatisfactory when time is of the essence because of the necessity to move only a full or substantially full load. Transport Storage's operating procedures, as expressed by its general manager, are even more stringent. It is inconceivable, of course, that if the applicants are granted the authority requested, they will always have equipment available to meet the needs of the occasional or small shipper. Certainly, also, it would be economic suicide and not in the public interest to certificate a carrier who will too sparsely use his equipment. However, the thrust of the commission's ruling, and its proposed answer to the expressed needs of the intrastate shipping public, lies in its determination to permit a small carrier to enter the intrastate field—one who is not "burdened" by the fact that the overwhelming bulk of its business is generated through interstate commerce, and therefore, one who hopefully will more adequately respond to the requirements of the small shipper.

The second answer is expressed in legal overtones. The protesting carriers cite the principle enunciated by the ICC that shippers must utilize the existing services before a new service will be established.

We have consistently stated that it is the duty of shippers to inform themselves of existing service, before seeking additional motor-carrier authorization. Several opposing carriers are experienced operators and have not been given an opportunity to serve the shippers. Until their services have been tried and found inadequate in some substantial respect, we have no basis for the conclusion

that the public convenience and necessity require the additional service proposed.

*Warren Transp., Inc., Common Carrier Application* 69 M.C.C. 241, 246-247 (1956).

██ Assuming, without deciding, that the general principle enunciated in *Warren Transport* has been, and is still, applied universally by the ICC, we do not deem its universal application is mandatory by the WUTC. We have not been provided with any judicial precedent which has approved universal application of this administratively declared rule of law, nor have we, in our own limited research, uncovered any such judicial approval. Obviously, interpretations by the ICC of federal statutes substantially similar to our present state statute constitute cogent authority insofar as they bear on issues before us. *Black Ball Freight Serv., Inc. v. Washington Util. & Transp. Comm'n,* 74 Wn.2d 871, 447 P.2d 597 (1968). However, neither the courts of this state nor the administrative agency which regulates within its appropriate sphere of responsibility is bound to follow, blindly, administrative interpretations of a similarly constituted federal agency operating under a substantially similar statute. A case by case application or rejection of an administratively promulgated principle seems more nearly consistent with sound administration of regulatory programs. In particular, the WUTC should be free to continue to develop its own economic philosophy of how best to maintain a viable transportation system to satisfy the intrastate needs of the using public, unfettered by federal precedents which, under the guise of a rule of law, actually expostulate a given philosophical or economic position.

██ In the case at bar, where both existing carriers experience the same general percentage distribution of equipment as between interstate and intrastate commerce, *and* where the effect of the regulatory action is to introduce a third carrier, hopefully more responsive to the specific needs of the intrastate shippers, we hold it is not necessary, in order to sustain a finding of public necessity, that ship-

pers have actually experienced the services of both existing carriers.

Finally, then, we turn to the last issue. The protesting carriers' petition to reopen the hearings—filed subsequent to issuance of the examiner's proposed order and renewed after issuance of the commission's final order—alleged that facts and circumstances had changed since the hearing of August, 1967, in that "applicants have completely abandoned their operations and have divested themselves of all or virtually all, of the equipment which they alleged they owned and/or operated at the time of the hearings." The applicants' reply acknowledged disposition of such equipment and questioned why it would have been necessary—absent any authority to transport *any* vehicles—to have retained such equipment for 9 months while the matter was pending before the commission. (We might add that a considerably longer period has elapsed pending successive appeals to the superior court and to this court.) The thrust of the carriers' argument is that the commission resolved this matter without actually receiving evidence as to any of the allegations to support any finding whatsoever.

In order to analyze this issue it is necessary to examine the statutory authority under which the commission grants or denies a permit or extension thereof.

A permit or extension thereof shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operations covered by the application, if it is found that the applicant is *fit, willing, and able* properly to perform the services proposed and conform to the provisions of this chapter and the requirements, rules and regulations of the commission thereunder, and that such operations will be consistent with the public interest, and, in the case of common carriers, that the same are or will be required by the present or future public convenience and necessity, otherwise such application shall be denied.

(Italics ours.) RCW 81.80.070.

■ There is nothing in the statutory grant of authority which requires that the applicants be continuously engaged

in the active operation of the transport business at the time the commission acts upon an application. Under the facts of this case, when it was a known fact at the conclusion of the hearing that the applicants' temporary grant of authority had already been terminated by the ICC, it would be totally unrealistic to expect that such business be required to maintain its equipment and facilities, and pay necessary expenses thereon, during a period when no revenues could legally be derived therefrom. Temporary permits to engage in intrastate commerce may, themselves, only be issued for 180 days. RCW 81.80.170. Protesting carriers obviously have a right to pursue their legal remedies through the appellate process. The commission, in effect, held that an applicant need not remain in active operation during the period required to process a request for extension of services. Such a holding is not inconsistent with a finding that at the time of hearing the applicant had demonstrated its capacity to be fit, willing and able to properly perform the services at such time as the permit may ultimately be granted. The commission was acting neither arbitrarily nor capriciously in denying the protesting carriers' petition to reopen for newly discovered evidence based on this allegation of a change of facts and circumstances.

Judgment affirmed.

ARMSTRONG, C. J., and PEARSON, J., concur.